UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


VICKI FABIAN,

       Plaintiff,                                     Hon. Ellen S. Carmody

v.

                                                     Case No. 1:11-cv-287

COMMISSIONER OF
SOCIAL SECURITY,

       Defendant.

_____/


## **OPINION**

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. On August 3, 2011, the parties agreed to proceed in this Court for all further proceedings, including an order of final judgment. (Dkt. #11).

        Section 405(g) limits the Court to a review of the administrative record and provides that if the Commissioner's decision is supported by substantial evidence it shall be conclusive. The Commissioner has found that Plaintiff is not disabled within the meaning of the Act. For the reasons stated below, the Court concludes that the Commissioner's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**.

1

## **STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial

interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 50 years old on the date her insured status expired. (Tr. 18, 157). She completed one year of college and worked previously as a laborer and machine operator. (Tr. 22, 28, 214-21).

Plaintiff applied for DIB benefits on October 31, 2007,[1] alleging that she had been disabled since October 15, 2001, due to a back injury, an ankle impairment, arthritis, and colon cancer. (Tr. 157-59, 198). Plaintiff's application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 82-153). On December 17, 2009, Plaintiff appeared before ALJ Curt Marceille, with testimony being offered by Plaintiff and a vocational expert. (Tr. 40-81). In a written decision dated January 28, 2010, the ALJ determined that Plaintiff was not disabled. (Tr. 16-29). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 1-5). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

Plaintiff's insured status expired on December 31, 2006. (Tr. 18). Accordingly, to be eligible for Disability Insurance Benefits under Title II of the Social Security Act, Plaintiff must establish that she became disabled prior to the expiration of her insured status. *See* 42 U.S.C. § 423;

---

[1] Plaintiff also applied for Supplemental Security Income (SSI) benefits, but this application was denied at the outset "because of [Plaintiff's] income." (Tr. 112). Thus, the ALJ only reviewed Plaintiff's DIB claim.

3

*Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

## **RELEVANT MEDICAL HISTORY**

On September 1, 2001, Plaintiff participated in an MRI examination of her lumbar spine the results of which revealed "mild bulging of the L4-5 disc." (Tr. 353). The examination also revealed that "there is no vertebral collapse nor subluxation" and that "the discs have normal disc height and signal intensity." (Tr. 353).

On March 31, 2003, Plaintiff participated in a CT scan of her brain the results of which revealed "normal ventricular system and midline structures" and "no acute mass lesion, mass effect or area of intracranial hemorrhage." (Tr.416). A carotid ultrasound examination, performed the same day, was "unremarkable" with "no evidence of significant stenosis." (Tr. 415).

Treatment notes dated June 20, 2003, indicate that Plaintiff "attends aerobics five days a week." (Tr. 331).

X-rays of Plaintiff's right knee, taken on June 17, 2004, revealed the following:

> There is subtle narrowing of the medial compartment of the tibiofemoral joint which likely reflects very early degenerative arthritis. No spurring or sclerosis identified at this time. Lateral compartment appears to be well preserved. Patellofemoral joint unremarkable. No joint effusion or other abnormality.

(Tr. 411).

Treatment notes dated September 21, 2005, indicate that Plaintiff was experiencing an "exacerbation of low back pain over the past week which seems to be aggravated by remodeling and carrying granite counter tops." (Tr. 341).

On January 3, 2006, Plaintiff participated in an echocardiogram stress test the results

of which were "negative." (Tr. 374). X-rays of Plaintiff's hips and pelvis, taken on February 13, 2006, revealed "no fractures, dislocations, or bony destructive lesions" and that the "joint spaces of the hips are well maintained bilaterally." (Tr. 372).

On July 21, 2006, Plaintiff underwent an anoscopy examination the results of which revealed the presence of Stage I anal intraepithelial neoplasia.[2] (Tr. 258-59).

On July 28, 2006, Plaintiff "got tangled up in the garden hose, tripped and fell" injuring her left ankle. (Tr. 287). X-rays of Plaintiff's left ankle, taken August 1, 2006, revealed "a lateral malleolus fracture and posterior malleolus fracture." (Tr. 288). On August 3, 2006, Plaintiff underwent surgery to repair her left ankle. (Tr. 299-300). X-rays of Plaintiff's left ankle, taken on September 8, 2006, revealed that "the ankle mortise is intact" and that there "is no medial clear space widening." (Tr. 284). Treatment notes dated September 22, 2006, indicate that Plaintiff's ankle fracture "is healing." (Tr. 280). On November 7, 2006, Plaintiff rated her left ankle pain as 2/10. (Tr. 271). Plaintiff was instructed to begin weight bearing on her ankle. (Tr. 271). Treatment notes dated November 17, 2006 indicate that Plaintiff was instructed to begin physical therapy "to work on range of motion and strengthening of the left ankle." (Tr. 268).

On March 7, 2007, Plaintiff completed a report regarding her activities. (Tr. 207-13). Plaintiff reported that she prepares meals, vacuums, dusts, washes dishes, cleans the bathroom, and washes laundry. (Tr. 208). Plaintiff also reported that she cares for her cat, shops for groceries, reads daily, talks on the telephone, and babysits her grandchildren. (Tr. 207-10).

---

[2] Anal intraepithelial neoplasia (AIN) is a "potentially pre-cancerous" condition. *See* What is Anal Cancer, available at http://www.cancer.org/Cancer/AnalCancer/DetailedGuide/anal-cancer-what-is-anal-cancer (last visited on August 14, 2012). AIN refers to "dysplasia occurring in the anus" and is divided into two groups: low-grade and high-grade. Low-grade AIN "has a low chance of turning into cancer" and "often goes away without treatment." High-grade AIN "is less likely to go away without treatment" and if left untreated "may eventually become cancer." Stage I AIN refers to a tumor or growth "that has not grown deeply into the nearby tissues and has not spread either to lymph nodes or other parts of the body." *See* Staging, available at http://www.cancer.net/all-about-cancer/treating-cancer/staging (last visited on August 14, 2012).

On April 2, 2007, Plaintiff participated in a consultive examination conducted by Steve Geiger, Ph.D. (Tr. 434-37). Plaintiff reported that she was disabled because of her ankle injury, colon cancer, and her mental state which she described as "not good." (Tr. 434). Plaintiff appeared depressed and anxious, but the results of a mental status examination were otherwise unremarkable. (Tr. 436-37). Plaintiff was diagnosed with (1) major depression, recurrent, moderate; and (2) generalized anxiety disorder, moderate. (Tr. 437). Plaintiff's GAF score was rated as 54.[3] (Tr. 437).

On April 19, 2007, Rom Kriauciunas, Ph.D. completed a Mental Residual Functional Capacity Assessment form regarding Plaintiff's limitations in 20 separate categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation. (Tr. 427-29). Plaintiff's abilities were characterized as "moderately limited" in five categories. (Tr. 427-28). With respect to the remaining 15 categories, however, the doctor reported that Plaintiff was "not significantly limited." (Tr. 427-28).

On September 24, 2007, Plaintiff was examined by Dr. William Lee. (Tr. 823-25). Plaintiff reported that "she recently started having increased pain and swelling of her [left] foot and ankle." (Tr. 823). X-rays of Plaintiff's left ankle revealed "calcification of the inner osseous ligament between the distal tibia and fibula." (Tr. 823). The x-rays further revealed, however, that Plaintiff's "fracture is healed...the ankle mortise is intact...[and] the ankle joint space is maintained." (Tr. 823). Dr. Lee concluded that Plaintiff "is developing an adult-acquired flat foot disorder" for which he recommended that Plaintiff be fitted with an orthotic device. (Tr. 823).

---

[3] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994) (hereinafter DSM-IV). A GAF score of 54 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning." DSM-IV at 34.

X-rays of Plaintiff's cervical spine, taken on November 12, 2007, revealed "mild to moderate" spondylosis at C6 and C7, but "no evidence for acute fracture or dislocation." (Tr. 357). X-rays of Plaintiff's thoracic spine, taken the same day, revealed "multilevel spondylotic changes with anterior osteophytes and disc space narrowing," but no evidence of fracture or dislocation. (Tr. 356). X-rays of Plaintiff's lumbosacral spine, also taken the same day, revealed "mild" compression deformities at L2-L4, but no evidence of spondylolisthesis. (Tr. 355).

On November 21, 2007, Plaintiff was examined by Dr. Lee. (Tr. 822). Plaintiff reported that "since she started wearing the orthotics, her pain level has improved a great deal." (Tr. 822). Specifically, Plaintiff rated her ankle pain as "2/10." (Tr. 822). The doctor observed that "with her orthotics in [her] shoes, her foot posture looks much better" and "she also walks with a fluid gait." (Tr. 822). Dr. Lee recommended that Plaintiff participate in physical therapy "to work on strengthening of her left ankle now that she has the orthotics." (Tr. 822).

On November 28, 2007, Blaine Pinaire, Ph.D. completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 452-65). Determining that Plaintiff suffered from a major depressive disorder, the doctor concluded that Plaintiff satisfied the Part A criteria for Section 12.04 (Affective Disorders) of the Listing of Impairments. (Tr. 453-61, 464 ). The doctor determined, however, that Plaintiff failed to satisfy any of the Part B criteria for this particular Listing. (Tr. 462). Specifically, the doctor concluded that Plaintiff experienced mild restrictions in the activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and once or twice experienced extended episodes of decompensation. (Tr. 462).

Dr. Pinaire also completed a Mental Residual Functional Capacity Assessment form

regarding Plaintiff's limitations in 20 separate categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation. (Tr. 466-68). Plaintiff's abilities were characterized as "moderately limited" in five categories. (Tr. 466-67). With respect to the remaining 15 categories, however, the doctor reported that Plaintiff was "not significantly limited." (Tr. 466-67).

On December 8, 2008, Dr. Bradford Wylie completed a form regarding Plaintiff's physical limitations. (Tr. 793). The doctor reported that Plaintiff "can work" two hours daily. (Tr. 793). The doctor reported that Plaintiff can stand and sit continuously for 30 minutes each and, furthermore, that during an entire workday, Plaintiff can stand for only 60 minutes and can sit for only two hours. (Tr. 793). The doctor reported that Plaintiff can lift only five pounds and can never bend or stoop. (Tr. 793). The doctor reported that Plaintiff can only occasionally balance, perform manipulative activities with her upper extremities, and raise her arms over her shoulder. (Tr. 793). The doctor also reported that Plaintiff would need to "frequently" elevate her legs during an eight-hour workday. (Tr. 793). The doctor did not, however, indicate the date on which these alleged limitations went into effect.

On March 6, 2009, Plaintiff's counsel authored a letter to Dr. Wylie concerning the doctor's December 8, 2008 evaluation of Plaintiff's physical limitations. (Tr. 795). In this letter, Plaintiff's counsel informed Dr. Wylie that Plaintiff would not receive disability benefits unless it could be established that she became disabled prior to December 31, 2006. (Tr. 795). Plaintiff's counsel then requested that the doctor identify the date on which Plaintiff "became disabled to the degree indicated in your opinion letter of 12/8/08." (Tr. 795). In response to this inquiry, Dr. Wylie reported that the limitations articulated in his December 8, 2008 assessment were effective as of July

21, 2006. (Tr. 795).

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[4] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the

---

[4]1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that through the date Plaintiff's insured status expired Plaintiff suffered from: (1) degenerative disc disease; (2) status post left lateral malleous fracture of the left ankle with surgical repair; (3) obesity; (4) depression; and (5) anal intraepithelial neoplasis (AIN), severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 18-21).

With respect to Plaintiff's residual functional capacity, the ALJ determined that through the date her insured status expired Plaintiff retained the capacity to perform work subject to the following limitations: (1) she can lift 20 pounds occasionally and 10 pounds frequently; (2) she can stand and walk for two hours during an 8-hour workday; (3) she can never climb ladders, ropes, or scaffolds; (4) she can occasionally crawl, balance, stoop, and climb ramps/stairs; (5) she can never crouch or kneel; (6) she must avoid moderate exposure to excessive vibration, unprotected heights and moving machinery; (7) she is limited to simple unskilled work with routine and repetitive tasks that require little or no decision making and only occasional changes in work setting; and (8) she can have occasional interaction with co-workers and the general public. (Tr. 21).

The ALJ determined that Plaintiff could not perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to

10

question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned a vocational expert.

The vocational expert testified that there existed approximately 19,000 jobs in the state of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 66-77). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006). The vocational expert further testified that the jobs she identified would accommodate a sit/stand option. (Tr. 75). The ALJ concluded, therefore, that Plaintiff was not entitled to benefits.

a. The ALJ Properly Evaluated the Medical Evidence

As noted above, on December 8, 2008, Dr. Wylie completed a form in which he opined that Plaintiff was limited to an extent far greater than that recognized by the ALJ. Plaintiff asserts that because Dr. Wylie was her treating physician, the ALJ was obligated to afford controlling weight to his opinion.

The treating physician doctrine recognizes that medical professionals who have a

11

long history of caring for a claimant and her maladies generally possess significant insight into her medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, "give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Wilson*, 378 F.3d at 544. In articulating such reasons, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *See* 20 C.F.R. §§ 404.1527, 416.927; *see also*, *Wilson*, 378 F.3d at 544. The ALJ is not required, however, to explicitly discuss each of these factors. *See, e.g.,*

*Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007). Instead, the record must reflect that the ALJ considered those factors relevant to his assessment. *See Oldham*, 509 F.3d at 1258; *Undheim*, 214 Fed. Appx. at 450.

The ALJ accorded "little weight" to Dr. Wylie's opinion. (Tr. 27). As the ALJ noted, the doctor articulated the opinion in question almost two years after the expiration of Plaintiff's insured status. The doctor failed, however, to indicate the date on which Plaintiff became impaired to the extent alleged. Only after Plaintiff's counsel informed the doctor of the necessity that Plaintiff's limitations be found to have been present prior to December 31, 2006, did Dr. Wylie indicate that such were in effect as of July 21, 2006, the date Plaintiff was diagnosed with Stage I anal intraepithelial neoplasia.

As the ALJ concluded, however, the record simply does not support that Plaintiff was disabled as of this date (or at any time prior to the expiration of her insured status) as a result of her AIN or any other impairment. With respect to Plaintiff's AIN, examinations conducted in July, September, and December 2007, revealed that Plaintiff was experiencing, almost one full year after the expiration of her insured status, "no symptoms." (Tr. 557, 572, 581). Plaintiff's left ankle fracture healed properly and with the subsequent use of an orthotic device Plaintiff was able to ambulate without difficulty or more than minimal pain. In sum, the record fails to reveal that Plaintiff was experiencing, prior to the expiration of her insured status, any limitations greater than those recognized by the ALJ. As the ALJ concluded, Dr. Wylie appears to have tailored his opinion, as clearly directed by Plaintiff's counsel, "in an effort to assist the claimant with whom he sympathizes." (Tr. 27). In sum, the decision by the ALJ to afford less than controlling weight to Dr. Wylie's opinion is supported by substantial evidence. This argument is, therefore, rejected.

## **CONCLUSION**

For the reasons articulated herein, the Court concludes that the ALJ's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**. A judgment consistent with this opinion will enter.


Date:  September 4, 2012                                 /s/ Ellen S. Carmody
                                                                            ELLEN S. CARMODY
                                                                            United States Magistrate Judge